<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-2133

        IN RE:  MICHAEL A. CUSUMANO AND DAVID B. YOFFIE

      [UNITED STATES OF AMERICA v. MICROSOFT CORPORATION].

                       __________________

                     MICROSOFT CORPORATION,

                     Petitioner, Appellant.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

         [Hon. Richard G. Stearns, U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
                                
          Coffin and Bownes, Senior Circuit Judges.
                                

    D. Stuart Meiklejohn, with whom John L. Warden, Richard J.
Urowsky, Steven J. Holley, Michael E. Swartz, Hilary M. Williams,
Sullivan & Cromwell, Thomas J. Sartory, Lynne Alix Morrison, and
Goulston & Storrs, P.C. were on brief, for petitioner.
    Jeffrey Swope, with whom Palmer & Dodge LLP was on brief, for
respondents Michael A. Cusumano and Massachusetts Institute of
Technology.
    Jonathan M. Albano, with whom Shaun B. Spencer, Bingham Dana
LLP, and Kimberly S. Budd, Office of the General Counsel, Harvard
University, were on brief, for respondents David B. Yoffie and
Harvard University.

December 15, 1998

 SELYA, Circuit Judge.  In this appeal, petitioner-
appellant Microsoft Corporation (Microsoft) invites us to reverse
the district court's denial of its motion to compel production of
research materials compiled by two academic investigators.  
Microsoft wants to use the subpoenaed materials in defending a
civil antitrust case,  United States v. Microsoft Corp., presently
being tried in the United States District Court for the District of
Columbia.  Mindful that important First Amendment values are at
stake, we decline Microsoft's invitation.
I.  THE ANTITRUST CASE
 We draw our description of the antitrust litigation in
large part from the court in which that litigation pends.  SeeUnited States v. Microsoft Corp., 1998 WL 614485 (D.D.C. 1998).
 Microsoft is one of the most profitable companies in the
computer industry.  It first attained a significant foothold in the
production of operating systems for the personal computer (PC)
market when a leading computer manufacturer, International Business
Machines Corporation, chose Microsoft's "MS-DOS" operating system
for its PCs in the early 1980s.  An operating system is the
"command center" of a PC.  Microsoft, 1998 WL 614485, at *2.  It  
facilitates the integrated use of hardware and software by
controlling the interaction between a PC's processor, its memory,
and devices like keyboards and disk drives.  In relatively short
order, Microsoft's operating systems achieved a preeminent market
position.  Microsoft continued to introduce new operating systems,
including its phenomenally successful "Windows" systems, which
allow a user to control a PC's operations by manipulating images on
the computer screen with a mouse, rather than by typing commands.
 The dominance of Microsoft's operating systems has been
maintained, in part, because of the symbiotic relationship that
exists between software and operating systems.  Software programs
utilize certain general functions of operating systems and are
written to work with particular systems.  Since more PCs depend on
Windows than on any rival, software creators tend to write products
for use on that system.  In turn, most PC users want this operating
system for their PCs, so that they can access the widest possible
range of software programs.  To keep this lucrative circle
spinning, Microsoft licenses its operating system to PC
manufacturers for pre-installation on new computers.
 Microsoft's achievements in the operating systems market
have encouraged it to spread its corporate wings.  It now produces
an internet browser product known as "Internet Explorer."  Browsers
are software programs that allow computer users to access,
manipulate, and display portions of the world-wide web (the Web).  
The Web is a set of sites that employ graphics, text, and other
media to provide information to viewers.  Among other things,
browsers can be used to translate these sites from the language of
their creation into a format intelligible to a user's particular
PC.  A browser can be purchased individually, acquired as an
accessory to a newly purchased PC, or downloaded from internet
access providers or other Web sites.
 Microsoft's success has not gone unremarked.  On May 18,
1998, the United States Department of Justice (DOJ) and several
state attorneys general brought suit in the United States District
Court for the District of Columbia, charging Microsoft with various
antitrust violations.  The complaint's main allegations center
around Microsoft's accretion of market share for its Internet
Explorer product.  DOJ asserts that Microsoft, mindful that
browsers potentially can be used as platforms on which to run
software and thus replace, or at least compete with, operating
systems, set out to increase its share of the browser market in a
no-holds-barred campaign to safeguard its hegemony in the operating
systems market.
 In January 1997, Navigator, a competing browser produced
by Netscape Communications Corporation (Netscape), boasted an 80%
share of the browser market.  Explorer enjoyed less than 20%.  DOJ
charges that Microsoft first essayed to increase its market share
by colluding with Netscape.  When Netscape rebuffed Microsoft's
overtures, DOJ alleges, Microsoft illegally "tied" Explorer to its
Windows operating system   refusing to grant computer manufacturers
licenses to pre-install Windows for their customers unless the
manufacturers agreed to pre-install Explorer and no other browser
 and thereby increased its share of the browser market to
approximately 50% by May of 1998.  Microsoft denies the
government's accusations.  It avers that it never tried to split
the browser market between itself and its competitors or to use
monopoly power in the operating systems market to capture a lion's
share of the browser market in an illegal fashion.  Instead, it
attributes its increased share of the browser market to Explorer's
superiority.
 The district court placed the antitrust litigation on a
fast track.  Among other things, the court established a tightly
compressed schedule for pretrial discovery; shortened the usual
time within which parties and non-parties alike might respond to
discovery requests; directed that witness lists (to include no more
than twelve trial witnesses per side, absent special permission) be
submitted no later than August 24, 1998 (just over three months
after the government sued); and closed discovery as of October 9,
1998 (save for discovery already underway).  After that date, new
discovery could be initiated only with leave of court.  A bench
trial commenced on October 19, 1998.  That trial is ongoing.
II.  THE RULE 45 PROCEEDINGS
 In the course of pretrial discovery in the antitrust
case, Microsoft learned about a forthcoming book entitled Competing
on Internet Time:  Lessons from Netscape and the Battle with
Microsoft (Lessons) and obtained a copy of the manuscript.  As its
title implies, Lessons deals extensively with the "browser war"
waged between Microsoft and Netscape.  Its authors (respondents-
appellees here) are distinguished academicians:  Michael A.
Cusumano, a tenured full professor at Massachusetts Institute of
Technology's Sloan School of Management, and David B. Yoffie, a
tenured full professor at Harvard Business School.
 As part of their research for Lessons, the respondents
interviewed over 40 current and former Netscape employees.  Their
interview protocol dealt with confidentiality on two levels.  
First, the respondents signed a nondisclosure agreement with
Netscape, in which they agreed not to disclose proprietary
information conveyed to them in the course of their investigation
except upon court order, and then only after giving Netscape notice
and an opportunity to oppose disclosure.  Second, the respondents
requested and received permission from interview subjects to record
their discussions, and, in return, promised that each interviewee
would be shown any quotes attributed to him upon completion of the
manuscript, so that he would have a chance to correct any errors or
to object to quotations selected by the authors for publication.
 On September 18, 1998, believing that certain statements
from Netscape employees reported in Lessons offered succor for its
defense, Microsoft subpoenaed the professors' notes, tape
recordings and transcripts of interviews, and correspondence with
interview subjects.  See Fed. R. Civ. P. 45.  The respondents
produced some correspondence, but declined to surrender the notes,
tapes, or transcripts.  Microsoft moved to compel the production of
these items on October 1, 1998.  Because the documents, if produced
at all, would be produced in Cambridge, the subpoenas issued from
the United States District Court for the District of Massachusetts
and the motion to compel was docketed there as an independent
proceeding.  See id. (requiring a subpoena commanding only document
production to "issue from the court for the district in which the
production . . . is to be made" and allowing enforcement "pursuant
to an order of th[at] court").  On October 7, the respondents filed
their oppositions.
    Following a hearing held the next day, the district court
denied the motion to compel ore tenus.  The court performed a case-
specific balancing analysis, taking into account a myriad of
factors.  On one hand, it found that Microsoft's need for the
information sought by the subpoenas, though real, was not great.  
Microsoft could have obtained that information directly from the
sources revealed by the manuscript, and, in all events, its main
thrust likely would be for purposes akin to impeachment.  On the
other hand, the court found that the respondents had a substantial
interest in keeping the subpoenaed information confidential and
that significant First Amendment values favored its protection.  
Balancing these and other elements, the court declined to compel
production of the notes, tapes, and transcripts.  Withal, the court
retained jurisdiction in order to review individual items in camerafor materiality on Microsoft's later motion and proclaimed its
readiness to order specific material produced upon a showing of
particularized need.  Microsoft now appeals.
III.  APPELLATE JURISDICTION
    Federal courts, as courts of limited jurisdiction, may
not presume the existence of subject matter jurisdiction, but,
rather, must appraise their own authority to hear and determine
particular cases.  See Viqueira v. First Bank, 140 F.3d 12, 16 (1st
Cir. 1998).  We do so here.
    The procedural posture of this case is unusual.  
Microsoft, a litigant in a court in another district, moved in the
District of Massachusetts to compel the respondents (who are not
parties to that litigation) to honor subpoenas duces tecum.  When
the respondents objected, the district court obliged them, but
retained jurisdiction to hear particularized claims of need.  
Meanwhile, the primary action is ongoing   and any appeal therein
will go, in the first instance, to the District of Columbia
Circuit.
    Our customary appellate jurisdiction extends to "final
decisions of the district courts."  28 U.S.C.  1291.  Still, a
decision or order can be final in the sense needed to confer
appellate jurisdiction even if the proceeding in which it is
rendered is ancillary to some other proceeding.  Thus, in Horizons
Titanium Corp. v. Norton Co., 290 F.2d 421 (1st Cir. 1961), a
disappointed patent-seeker subpoenaed documents from a competitor
for use in an action challenging the dismissal of its patent
application.  See id. at 421-22.  The subpoenaed firm did not
comply, and the patent-seeker moved to compel production in the
United States District Court for the District of Massachusetts
(although the principal dispute was pending elsewhere).  See id. at
421.  When the district court refused to order production of the
documents, the patent-seeker appealed.  In rejecting the subpoenaed
firm's assertion that the court of appeals lacked jurisdiction, we
explained that "the order of the district court made a final
disposition of the only proceedings in its district growing out of
a particular controversy, and the only proceeding pending between
these particular parties anywhere," and, thus, was final and
appealable.  Id. at 424.  So it is here.
    Nor does the district court's decision to retain
jurisdiction detract from the immediate appealability of its order.  
It is settled law that a court's retention of jurisdiction in order
to facilitate the consideration of possible future relief does not
undermine the finality of an otherwise appealable order.  See FTCv. Standard Fin. Mgmt. Corp., 830 F.2d 404, 407 (1st Cir. 1987);
FTC v. Texaco, Inc., 555 F.2d 862, 873 n.21 (D.C. Cir. 1977); seegenerally 15B Charles Alan Wright, et al., Federal Practice and
Procedure  3915.3 (2d ed. 1992) (explaining that an order's
vulnerability to possible change through subsequent proceedings
does not automatically deprive it of finality).  Consequently, we
have jurisdiction to hear and determine this appeal.
IV.  THE MERITS
    Microsoft argues that the district court underestimated
its need for the subpoenaed information because that information
would be useful not only for impeachment purposes, but also as
independent evidence of Netscape's business miscalculations.  SeeFed. R. Evid. 807; see also United States v. American Tel. & Tel.
Co., 516 F. Supp. 1237, 1239-42 (D.D.C. 1981) (admitting into
evidence in an antitrust prosecution documents authored by agents
of defendants' non-party competitors under the residual hearsay
exception).  Moreover, it had no other feasible way to obtain the
information since the accelerated schedule in the antitrust case
effectively thwarted direct discovery.  Turning to the other side
of the balance, Microsoft claims that the district court erred in
affording substantial protection to the subpoenaed materials
because those materials were not confidential and emanated from
disclosed sources.  In this regard, Microsoft tells us that the
only protectable data obtained by the respondents is proprietary
information covered by the nondisclosure agreement   an agreement
signed with Netscape, not with the individual interviewees.  
Microsoft further asserts that the interviews were not confidential
because the authors presented the manuscript, including quotes from
interviews, to Netscape executives and outside reviewers prior to
showing it to the persons quoted.
    The respondents dispute virtually all of Microsoft's
assertions.  They maintain that Microsoft does not really need the
information at all and that it can secure the same data through
other, less intrusive avenues.  Furthermore, the respondents
asseverate that they are sufficiently like journalists for the
protection afforded to journalists' materials to be applied here;
that the information which they procured is confidential because of
their interview protocol; and that forcing them to disclose the
contents of the notes, tapes, and transcripts would endanger the
values of academic freedom safeguarded by the First Amendment and
jeopardize the future information-gathering activities of academic
researchers.
                    A.  Standard of Review.
    To resolve these issues, we focus first on the applicable
standard of review.  Discovery orders ordinarily are reviewed for
abuse of discretion.  See Dykes v. DePuy, Inc., 140 F.3d 31, 36-37
(1st Cir. 1998); Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179,
186-87 (1st Cir. 1989).  Microsoft seeks to bend this rule and
obtain plenary review.  It proffers two reasons.
    Microsoft's first ground is barren.  It  points out that
the district court did not take testimony, but, rather, decided the
case solely on a paper record, assisted by arguments of counsel.  
Thus, Microsoft contends, there is no occasion to defer since this
court is equally well-equipped to evaluate the corpus of evidence
upon which the district court based its decision.  This line of
argument is neither original nor persuasive.  It has been tried
before, and regularly rejected.  See, e.g., United States Liab.
Ins. Co. v. Selman, 70 F.3d 684, 688 (1st Cir. 1995); In re Tully,
818 F.2d 106, 108-10 (1st Cir. 1987).  We, too, dismiss it.
    Microsoft's second ground holds out more promise as a
theoretical matter.  It asserts that the lower court applied an
incorrect legal standard   and ample authority supports the
proposition that, whatever the procedural context, pure questions
of law warrant de novo review.  See, e.g., McCarthy v. Azure, 22
F.3d 351, 354 (1st Cir. 1994); In re Howard, 996 F.2d 1320, 1327
(1st Cir. 1993).  Here, however, Microsoft's argument fails
because, as we explain below, the district court's test, which
balanced the need for disclosure against the desirability of
confidentiality, is correct as a matter of law.  Refined to bare
essence, Microsoft's quarrel with the district court's
determination concerns the manner in which the court struck the
required balance, rather than its selection of a legal rule.  Since
abuse of discretion is the precise rubric under which an appellate
court should review a district court's application of a legal rule
to the facts it has found, our review proceeds accordingly.
                   B.  The Analytic Approach.
    The discovery rules apply to subpoenas issued under Fed.
R. Civ. P. 45.  See 9A Wright et al., supra,  2452.  Thus, we
start with Fed. R. Civ. P. 26(b)(2), which admonishes generally
that:
    the . . . extent of the use of the discovery
    methods otherwise permitted under these rules
    . . . shall be limited by the court if it
    determines that:  (i) the discovery sought is
    unreasonably cumulative or duplicative, or is
    obtainable from some other source that is more
    convenient, less burdensome, or less
    expensive; (ii) the party seeking discovery
    has had ample opportunity by discovery in the
    action to obtain the information sought; or
    (iii) the burden or expense of the proposed
    discovery outweighs its likely benefit, taking
    into account the needs of the case, the amount
    in controversy, the parties' resources, the
    importance of the issues at stake in the
    litigation, and the importance of the proposed
    discovery in resolving the issues.

This admonition forms the backdrop against which a court must
consider whether to enforce a subpoena duces tecum issued as an
instrument of discovery in a civil case.
    From that point forward, our study of the merits of this
appeal must proceed in steps.  Initially, we must determine whether
the respondents' academic research is protected in a manner similar
to the work product of journalists.  This inquiry entails two
aspects:  (1) whether the respondents' positions warrant conferral
of any special consideration, and (2) whether their research
comprises confidential information.  If these hurdles are cleared,
we next must determine the type and kind of protection that the law
affords.  Finally, we must assess the district court's application
of the law to the facts, and the appropriateness of its order.
              C.  The Availability of Protection.
    1.  Who Is Protected?  Microsoft acknowledges that the
law supplies a measure of protection for materials compiled by
journalists.  See Bruno & Stillman, Inc. v. Globe Newspaper Co.,
633 F.2d 583, 595-98 (1st Cir. 1980).  The respondents, however,
are academic researchers and commentators, not professional
newsmen.  We do not think that this makes a dispositive difference
in whether special protection vests.  Academicians engaged in pre-
publication research should be accorded protection commensurate to
that which the law provides for journalists.
    Courts afford journalists a measure of protection from
discovery initiatives in order not to undermine their ability to
gather and disseminate information.  See United States v. LaRouche
Campaign, 841 F.2d 1176, 1181 (1st Cir. 1988).  Journalists are the
personification of a free press, and to withhold such protection
would invite a "chilling effect on speech," id., and thus
destabilize the First Amendment.  The same concerns suggest that
courts ought to offer similar protection to academicians engaged in
scholarly research.  After all, scholars too are information
gatherers and disseminators.  If their research materials were
freely subject to subpoena, their sources likely would refuse to
confide in them.  As with reporters, a drying-up of sources would
sharply curtail the information available to academic researchers
and thus would restrict their output.  Just as a journalist,
stripped of sources, would write fewer, less incisive articles, an
academician, stripped of sources, would be able to provide fewer,
less cogent analyses.  Such similarities of concern and function
militate in favor of a similar level of protection for journalists
and academic researchers.
    Given this mise-en-scne, it is unsurprising that several
of our sister circuits have held that the medium an individual uses
to provide his investigative reporting to the public does not make
a dispositive difference in the degree of protection accorded to
his work.  See In re Madden, 151 F.3d 125, 128-31 (3d Cir. 1998);
Shoen v. Shoen, 5 F.3d 1289, 1293-94 (9th Cir. 1993); von Bulow v.
von Bulow, 811 F.2d 136, 142-44 (2d Cir. 1987).   Whether the
creator of the materials is a member of the media or of the
academy, the courts will make a measure of protection available to
him as long as he intended "at the inception of the newsgathering
process" to use the fruits of his research "to disseminate
information to the public."  von Bulow, 811 F.2d at 144.
    This case fits neatly into the architecture of these
precedents.  The sole purpose of the respondents' interviews of
Netscape personnel was to gather data so that they could compile,
analyze, and report their findings anent management practices in
the internet technology industry.  Thus, the respondents are within
a group whose pre-publication research merits a modicum of
protection.
    2.  What Is Protected?  This aspect of the question
raises vexing theoretical issues.  Leaving confidential sources to
one side, the prototypical situation in which a court provides
protection from disclosure for a journalist's or researcher's
materials involves confidential information.  See, e.g, United
States v. Cuthbertson, 630 F.2d 139, 146-48 (3d Cir. 1980).  When
the information cannot fairly be characterized as confidential, the
courts are divided as to whether any protection is warranted.  
Compare Shoen, 5 F.3d at 1295-96 (holding that materials should be
afforded protection even if the information contained therein is
not confidential) with Gonzales v. National Broad. Co., 155 F.3d
618, 626 (2d Cir. 1998) (disavowing protection for non-confidential
information).  Although we have not ruled definitively on this
issue, we have noted, in a situation involving only nonconfidential
information, "a lurking and subtle threat to journalists and their
employers if disclosure of outtakes, notes, and other unused
information, even if nonconfidential, becomes routine and casually,
if not cavalierly, compelled."  LaRouche, 841 F.2d at 1182.
    We perceive no need to resolve this unanswered question
today.  The district court found that the information sought by
Microsoft was confidential in character, and the record
sufficiently supports this finding.  To be sure, confidentiality
comes in varying shapes and sizes.  The confidentiality agreed upon
by the authors and the interviewees in this instance does not
ensure the most perfect privacy.  The respondents did not offer the
interviewees the sort of detailed nondisclosure agreement that they
signed with Netscape.  Moreover, they conducted the interviews in
the presence of a Netscape official, gave Netscape's management a
preview of planned quotations prior to showing those statements to
the persons who made them, and circulated their manuscript (or
portions of it) for pre-publication peer review.
    Still, determinations of where particular disclosures
fall along the continuum of confidentiality, and related
determinations anent the degree of protection that attaches to
them, must take into account the totality of the circumstances.  
When the respondents began their inquiry into Netscape's management
practices early in 1997, neither they nor their interview subjects
knew (or had any reason to believe) that Microsoft later would be
sued for antitrust violations based upon its peregrinations in the
browser market.  In that environment, handing individual interview
subjects complex legal agreements might have made them squeamish
(and thus less candid).  Instead, the respondents gave each
interviewee a personal, albeit verbal, assurance that he would be
accorded the opportunity to correct, comment upon, and/or disclaim
attributed quotations prior to publication.  At the very least,
this assurance is a species of confidentiality.  Microsoft's demand
for the full tapes (including outtakes) and transcripts of
interviews with all Netscape employees   materials which have not
to date been shown to anyone   obviates this assurance.  While the
level of confidentiality that characterizes a journalist's or
researcher's confidential information may, in the end, affect the
degree of protection conferred upon that information in a discovery
dispute, we agree with the district court that the interviews here
fall along the continuum of confidentiality at a point sufficient
to justify significant protection.
                 D.  The Degree of Protection.
    We turn now to the degree of protection that attaches to
the respondents' materials.  We begin with Bruno & Stillman, an
opinion that had its genesis in a libel suit brought by a
commercial boatbuilder against the Boston Globe after one Coughlin,
a Globe reporter, wrote an unflattering article.  See Bruno &
Stillman, 633 F.2d at 584-85.  During discovery, the defendants
refused to turn over portions of Coughlin's notes, which named
confidential sources and outlined information that the sources had
supplied.  See id. at 585.  The district court compelled disclosure
of the information, based on a finding that the information was
critical to Bruno & Stillman's non-frivolous claim and was
unavailable from other sources.  See id. at 586.  On appeal,
without deciding the "semantic[]" question of whether the
protection afforded to a journalist's sources and research is a
type of privilege, id. at 595, Judge Coffin explained the necessity
for attention to First Amendment concerns in such situations, seeid. at 595-96.  The opinion instructed district courts that when
    faced with enforcing requests for the
    discovery of materials used in the preparation
    of journalistic reports [they] should be aware
    of the possibility that the unlimited or
    unthinking allowance of such requests will
    impinge upon First Amendment rights.  In
    determining what, if any, limits should
    accordingly be placed upon the granting of
    such requests, courts must balance the
    potential harm to the free flow of information
    that might result against the asserted need
    for the requested information.

Id.  Eight years later, the court reiterated this instruction.  SeeLaRouche, 841 F.2d at 1181.
    We, too, decline to spend our energies on semantics.  It
suffices to say that, when a subpoena seeks divulgement of
confidential information compiled by a journalist or academic
researcher in anticipation of publication, courts must apply a
balancing test.  This test contemplates consideration of a myriad
of factors, often uniquely drawn out of the factual circumstances
of the particular case.  Each party comes to this test holding a
burden.  See Bruno & Stillman, 633 F.2d at 597.  Initially, the
movant must make a prima facie showing that his claim of need and
relevance is not frivolous.  See id.  Upon such a showing, the
burden shifts to the objector to demonstrate the basis for
withholding the information.  See id.  The court then must place
those factors that relate to the movant's need for the information
on one pan of the scales and those that reflect the objector's
interest in confidentiality and the potential injury to the free
flow of information that disclosure portends on the opposite pan.  
See id. at 597-98.
                  E.  Calibrating the Scales.
    We now examine the district court's handiwork in light of
this legal framework.  Microsoft's need admittedly is substantial
in the sense that relevant information likely exists   indeed, the
district court specifically found that Microsoft had not embarked
on a fishing expedition   and Microsoft has a legitimate use for
it.  The company, after all, is in the throes of defending a
complex case of extraordinary importance to its future, and its
primary defense is that Netscape suffered a series of self-
inflicted wounds that dissipated its dominant position in the
browser market.  Lessons includes several quotations that suggest
missteps by Netscape management during the browser war, and it is
reasonable to assume that the notes, tapes, and transcripts include
more evidence of this genre.  Hence, Microsoft has made a prima
facie showing of need and relevance.
    The district court discounted this showing somewhat
because it found that the same information was otherwise available
to Microsoft by direct discovery.  We view this finding of fact
deferentially, see Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,
102 F.3d 12, 16, 19-20 (1st Cir. 1996), and decline to disturb it.  
Despite the accelerated trial schedule in the antitrust case,
Microsoft had the Lessons manuscript while discovery was still
open, and the quotations in the book are attributed to named
individuals.  Microsoft   which deployed no fewer than eight
lawyers in the preparation of its brief in this appeal   had enough
time, enough knowledge, and enough resources to depose those
individuals (or some subset of them), or otherwise obtain discovery
from them.  This factor must figure in the balance.  See Haworth,
Inc. v. Herman Miller, Inc., 998 F.2d 975, 978 (Fed. Cir. 1993).
    The opposite pan of the scale is brim-full.  Scholars
studying management practices depend upon the voluntary revelations
of industry insiders to develop the factual infrastructure upon
which theoretical conclusions and practical predictions may rest.  
These insiders often lack enthusiasm for divulging their management
styles and business strategies to academics, who may in turn reveal
that information to the public.  Yet, pathbreaking work in
management science requires gathering data from those companies and
individuals operating in the most highly competitive fields of
industry, and it is in these cutting-edge areas that the
respondents concentrate their efforts.  Their time-tested interview
protocol, including the execution of a nondisclosure agreement with
the corporate entity being studied and the furnishing of personal
assurances of confidentiality to the persons being interviewed,
gives chary corporate executives a sense of security that greatly
facilitates the achievement of agreements to cooperate.  Thus, in
the Bruno & Stillman taxonomy, the interviews are "carefully
bargained-for" communications which deserve significant protection.  
Bruno & Stillman, 633 F.2d at 597.
    Considering these facts, it seems reasonable to conclude
 as the respondents' affidavits assert   that allowing Microsoft
to obtain the notes, tapes, and transcripts it covets would
hamstring not only the respondents' future research efforts but
also those of other similarly situated scholars.  This loss of
theoretical insight into the business world is of concern in and of
itself.  Even more important, compelling the disclosure of such
research materials would infrigidate the free flow of information
to the public, thus denigrating a fundamental First Amendment
value.
    It is also noteworthy that the respondents are strangers
to the antitrust litigation; insofar as the record reflects, they
have no dog in that fight.  Although discovery is by definition
invasive, parties to a law suit must accept its travails as a
natural concomitant of modern civil litigation.  Non-parties have
a different set of expectations.  Accordingly, concern for the
unwanted burden thrust upon non-parties is a factor entitled to
special weight in evaluating the balance of competing needs.  SeeHaworth, 998 F.2d at 978; Dart Indus. Co. v. Westwood Chem. Co.,
649 F.2d 646, 649 (9th Cir. 1980); Addamax Corp. v. Open Software
Found., Inc., 148 F.R.D. 462, 468 (D. Mass. 1993).
    We need go no further.  The district court used the
proper test, balanced the right array of factors, and acted well
within its discretion in determining that the scales tipped in
favor of preserving confidentiality and against the wholesale
disclosure of investigative materials gleaned in the course of pre-
publication academic research.  Our confidence in the
appropriateness of this ruling is fortified by the fact that the
district court took pains to protect Microsoft's legitimate
interests.  After denying the motion to compel, the court announced
that it would retain jurisdiction so that, should a material
conflict develop between quotations from the book and other
evidence, it could review the notes, tapes, and transcripts incamera for purposes of verification and, if necessary, order
production.  This even-handed ruling treats all parties fairly.  We
discern no error.

Affirmed.

</body>

</html>