**UNITED STATES of America, Appellee,**

v.

**The LaROUCHE CAMPAIGN, et al., Defendants, Appellees.**

**Appeal of NATIONAL BROADCASTING COMPANY, INC.**

No. 87–2054.

United States Court of Appeals, First Circuit.

Heard Jan. 5, 1988.

Decided March 9, 1988.

Floyd Abrams with whom Devereux Chatillon, Albert Robbins, Cahill Gordon & Reindel, New York City, Michael J. Liston and Palmer & Dodge, Boston, Mass., were on brief, for appellant.

Robert L. Rossi with whom Odin P. Anderson and Anderson & Associates, P.C., Boston, Mass., were on brief, for defendants, appellees.

Mark D. Rasch, Dept. of Justice, Washington, D.C., with whom Frank L. McNamara, Jr., U.S. Atty., and John J.E. Markham, II, Asst. U.S. Atty., Boston, Mass., were on brief, for U.S.

Before COFFIN, ALDRICH and BREYER, Circuit Judges.

COFFIN, Circuit Judge.

This appeal arises out of a pretrial ruling enforcing a subpoena of a third party witness in connection with a pending criminal prosecution of Lyndon H. LaRouche, "The LaRouche Campaign," and seventeen other entities and individuals affiliated with that campaign. The indictment charged mail and wire fraud involving fraudulent credit card charges related to LaRouche's 1984 presidential campaign; it also charged a conspiracy to obstruct justice by preventing a grand jury from gathering evidence on the mail and wire fraud counts. The appeal is that of the National Broadcasting Company, Inc. (NBC) from a ruling of the District Court for the District of Massachusetts enforcing a subpoena *ducus tecum*. The court had ordered NBC to submit, for *in camera* review, "outtakes" (videotaped material not broadcast) of an interview with a prospective key witness, a small portion of which was broadcast in April, 1986.[1] NBC refused to comply, was found in civil contempt, and fined $500 a day; the fine has been stayed pending the disposition of this expedited appeal.

The subject of the interview was one Forrest Lee Fick who, during much of the period charged in the indictment, was, along with one Roy Frankhauser, a paid consultant to the Security and Intelligence Staff of the LaRouche organization. Four defendants in the pending criminal prosecution—Jeffrey and Michelle Steinberg, Paul Goldstein, and Robert Greenburg—were members of that staff. Frankhauser, a severed defendant, was charged along with these four and other co-defendants with, *inter alia*, participating in the conspiracy to obstruct justice. After a jury trial, before the same district judge whose order is before us in the instant case, Frankhauser was convicted on the obstruction of justice count.

In preparation for the April broadcast, NBC conducted an interview with Fick, lasting for an hour and forty minutes. During the approximately one-minute portion actually broadcast, Fick's comments were confined to the animus with which the LaRouche organization viewed Henry Kissinger and defendant Goldstein's alleged suggestion that Kissinger be assassinated. This paralleled some of Fick's testimony in the Frankhauser trial.

Counsel for defendant Jeffrey Steinberg served a subpoena *duces tecum* on NBC in October, 1987, seeking "[v]ideo tapes of interviews of Forrest Lee Fick ... including all out-takes of such interviews; all records of any payment of money to Forrest Lee Fick ... including amount of payment, date of payment, manner of payment, and reason for payment." All other defendants joined in this effort. NBC moved to quash the subpoena. Argument was heard and briefs submitted.

The district court first ruled that federal law recognized a qualified news gatherers' privilege. The court recognized its duty to weigh the competing First Amendment interests of NBC and the fair trial/confrontation interests of defendants not only generically but as they exist in the instant case. It proceeded to consider whether defendants had shown sufficient compliance with Rule 17(c) of the Federal Rules of Criminal Procedure. The court found that Fick was expected to be called as a government witness, and that it was likely that some statements made in the course of Fick's lengthy interview would be inconsistent with his trial testimony and might also show bias. The court further found that defendants had made only a weak showing that such evidence would be other than cumulative.[2]

---

1. Outtakes were also requested from a broadcast in December, 1986, but the tapes had been reused, wiping out the recordings sought.

2. The court also reviewed, at the same time, the propriety of a subpoena ordering Columbia Broadcasting System (CBS) to produce outtakes of interviews involving one Tate. This matter is

The court concluded that defendants had made a threshold showing of likelihood that admissible evidence would be obtained through the subpoena and that evidence that Fick had been paid for the interview would be admissible on the issue of Fick's credibility.

The court then turned to the question of First Amendment privilege. Noting that the subpoened outtakes involved no confidential sources, the court observed that "[e]ven if the news gatherers' privilege is held to extend beyond the protection of confidential sources, ... the showing made by ... NBC ... is a weak showing relative to ... the interests commonly implicated in circumstances in which the assertion of the news gatherers' privilege is invoked." The court concluded that it should order production but, to minimize intrusion, required that the materials be submitted under seal subject to *in camera* review and possible release to defendants later on.[3] Refusal to produce, adjudication of civil contempt, and appeal followed.

Because the district court's contempt order is intimately connected to its denial of NBC's motion to quash, we review the propriety of the order for abuse of discretion. *See AMF, Inc. v. Jewett,* 711 F.2d 1096, 1100 (1st Cir.1983); *United States v. Lieberman,* 608 F.2d 889, 904 (1st Cir.1979). *See also Greater Newburyport Clamshell Alliance v. Public Service Company of New Hampshire,* 838 F.2d 13, 17 (1st Cir. 1988) (validity of civil contempt order depends on correctness of underlying discovery order that was violated).

This case presents an intersection of several issues: whether the district court properly denied NBC's motion to quash and ordered *in camera* review in accordance with the requirements of Rule 17(c); if so, whether NBC's First Amendment interests in not producing the outtakes for *in camera* review outweigh the constitutional rights of the defendants that are furthered by such review; what considerations should govern the court in conducting its *in camera* review; and what procedure the court should follow in determining whether to release any of the materials to defendants.

We find general guidance as to these issues in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Thus, we consider first NBC's contention that the defendants' subpoena failed to satisfy the requirements of Rule 17(c); for we need not address the competing constitutional interests in question unless the defendants' subpoena met those requirements. *Id.* at 698, 94 S.Ct. at 3102–03.[4]

### Compliance with Rule 17(c)

NBC argues that defendants' subpoena did not meet the requirements of Rule 17(c) of the Federal Rules of Criminal Procedure. Specifically, it asserts that (a) the district court should have quashed the subpoena because it was "unreasonable and oppressive" and (b) the district court should not have ordered *in camera* review because the defendants failed to show that the material sought was sufficiently evi-

---

not before us, CBS having complied with the court's *in camera* order. The only point of possible relevance is that the court deemed defendants' showing even weaker vis-a-vis NBC than against CBS, the latter's broadcast bearing a closer relationship to the criminal trial issues.

3. Not committing itself to a decision whether or not to disclose materials to defendants before trial the court said: "I envision that even if I make a determination by reviewing the transcripts [of the outtakes] before the witness goes onto the stand, as I think I should preserve the option of doing, I may determine that some part of the material be disclosed immediately and that other parts not be disclosed but then may have to reexamine that question after I have heard testimony of the witness."

4. NBC asserts that it has a "privilege" to withhold subpoenaed material from criminal proceedings that is grounded in the First Amendment and "federal common law." While we address *infra* the First Amendment interests at stake, we reject NBC's reliance upon a federal common law privilege wholly apart from the First Amendment. *See United States v. Liddy,* 354 F.Supp. 208, 214 & n. 15 (D.D.C.), *emergency motions for stay denied,* 478 F.2d 586 (D.C. Cir.1972). *See generally* Annotation, *Privilege of Newsgatherer Against Disclosure of Confidential Sources or Information,* 99 A.L.R.3d 37, 47–53 (1980).

dentiary.[5] We think that the district court was well within its discretion in denying the motion to quash and ordering *in camera* review pursuant to Rule 17(c).

The procedural background in *Nixon* was quite similar to that in the instant case. In *Nixon*, the President's counsel moved to quash the Special Prosecutor's subpoena for the infamous tapes on the grounds that the subpoena failed to meet Rule 17(c) standards and that the tapes were subject to executive privilege. The district court denied the motion to quash and ordered the tapes produced for *in camera* inspection. There was no withholding at that stage, and, therefore, no contempt citation. The district court stayed its order denying the motion to quash and for *in camera* inspection, however, to allow Nixon the opportunity to appeal, and materials filed under seal remained so when the record was transmitted on appeal. *Id.* at 689, 94 S.Ct. at 3098. The appeal moved directly to the Supreme Court.

After disposing of preliminary jurisdictional matters, the Court first addressed whether the district court erred in denying the motion to quash on Rule 17(c) grounds. In setting out the standards which must be met, the Court did not distinguish between the production of materials for *in camera* inspection or for disclosure to the parties.[6] The Court said:

> [I]n order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to

obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*Id.* at 699–700, 94 S.Ct. at 3103 (footnote omitted). In short, the Court explained that the Special Prosecutor was required to clear three hurdles: (1) relevancy; (2) admissibility; and (3) specificity. *Id.* at 700, 94 S.Ct. at 3103.

Reviewing the record before it, the *Nixon* Court concluded that although the contents of the tapes could not, at the stage of *in camera* review, be described fully by the Special Prosecutor, "there was a *sufficient likelihood* that each of the tapes contain[ed] conversations relevant to the offenses charged in the indictment." 418 U.S. at 700, 94 S.Ct. at 3103 (emphasis added). It also concluded that there was a "*sufficient preliminary showing* that ... the subpoenaed tapes contain[ed] evidence admissible with respect to the offenses charged in the indictment." *Id.* (emphasis added).

In the case before us, the following facts were before the court: (1) Fick was not only a scheduled prosecution witness but it was uncontroverted that he would be a key witness, indeed one of the two most crucial government witnesses; (2) he had been professionally associated with several of the defendants in their "security and intelligence" work for most of the period charged in the indictment; (3) he had already testified at length in the Frankhauser trial—his likely testimony was not an unknown quantity to counsel or to the court; (4) his taped conversations with NBC occupied some 100 minutes, a very

---

5. Rule 17(c) provides:
   A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, doc-

uments or objects or portions thereof to be inspected by the parties and their attorneys.

6. While the Court found that the Special Prosecutor met the requirements of Rule 17(c), it did not announce a separate standard for determining whether the district court properly ordered *in camera* inspection, but simply pointed out later in the opinion that, based upon its examination of the record, it was "unable to conclude that the District Court erred in ordering the inspection." *Id.* at 714, 94 S.Ct. at 3110.

substantial period, and likely covered a wide range of subject matter drawn from his associations with the LaRouche organization; (5) as counsel pointed out, Fick's facial expressions might well be directly relevant to showing animus against defendants. All of this supports the district court's finding of likelihood that the outtakes would reveal inconsistent statements and bias; that is, relevant evidence, admissible at trial. No other source (by definition) being available, the subpoena is sufficiently specific for the purposes of Rule 17(c). *Cf. United States v. Cuthbertson,* 630 F.2d 139, 148 (3d Cir.1980) (*"Cuthbertson I"*) (such interview statements are "unique bits of evidence that are frozen at a particular place and time"). Together, these characteristics of the defendants' subpoena preclude our acceptance of NBC's suggestion that the subpoena was "unreasonable or oppressive." The threshold showing of admissibility, relevancy, and specificity having been met, we conclude that the district court did not abuse its discretion in ordering production for *in camera* review under Rule 17(c). *See Nixon,* 418 U.S. at 700, 94 S.Ct. at 3103.

We are cognizant of the fact that material sought by the defendants is intended for the sole purpose of impeaching Fick at trial, and we recognize that in *Nixon,* the Court said: "Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *Id.* at 701, 94 S.Ct. at 3104. This is because the admissibility prong of Rule 17(c) cannot be fully assessed until the corresponding witness testifies at trial. *United States v. Liddy,* 478 F.2d 586, 587–88 (D.C.Cir.1972) (separate opinion of Leventhal, J.). *See Cuthbertson I,* 630 F.2d at 144. Observation of this general rule, however, is left to the sound discretion of the district court. *United States v. Liddy,* 478 F.2d at 587–88 (pretrial production of impeachment testimony subject to interest and discretion of trial court in preventing unfairness and trial delays) (separate opinion of Leventhal, J.). And under the circumstances of this case, where a putative key witness, whose general testimony is already known, is scheduled to testify, we cannot hold it an abuse of discretion to compel the pretrial production of a substantial interview of that witness. *See id.* But *compare Cuthbertson I,* 630 F.2d at 145 (district court did not abuse its discretion in ordering *in camera* review of subpoenaed outtakes of prospective witness containing only impeachment evidence when such review would aid court's trial preparation) *with United States v. Cuthbertson,* 651 F.2d 189, 195, 197–98 (3d Cir.1981) (*Cuthbertson II*) (when district court failed to make a determination regarding admissibility of the same outtake material, it was abuse of discretion to order disclosure of the material to defendant before the corresponding witnesses testified at trial).[7]

### Appraising First Amendment Interests

■ The next step taken by the Court in *Nixon,* after holding that the subpoena *duces tecum* complied with Rule 17(c), was to assess the President's claim of privilege with reference to both execution of the subpoena and *in camera* review. Rejecting a claim of absolute privilege, the Court recognized a "presumptive privilege," 418 U.S. at 708, 94 S.Ct. at 3107–08, accorded to Presidential communications, an interest that "is weighty indeed and entitled to great respect," *id.* at 712, 94 S.Ct. at 3109, but, being "based only on the generalized interest in confidentiality ... must yield to the demonstrated, specific need for evi-

---

7. While we recognize that *Cuthbertson II* can be read to suggest that the admissibility requirement of Rule 17(c) strictly prohibits pretrial production of impeachment evidence by a third party for use by a criminal defendant in preparation for trial, *see also* 18 U.S.C. § 3500 (Jencks Act), courts have, on occasion, ordered the pretrial production of such materials to defendants. *E.g., United States v. Liddy,* 354 F.Supp. 208 (D.D.C.), *emergency motions for stay denied,* 478 F.2d 586 (D.C.Cir.1972). In the unique circumstances of this case, where an unindicted co-conspirator—whose interviews are the subject of the subpoena—will likely give testimony against the defendants that is substantially similar to the testimony he recently gave at the trial of a co-defendant, we are confident that the threshold showing of admissibility is sufficient such that the district court would be well within its discretion were it to decide to release the material to the defendants for trial preparation.

dence in a pending criminal trial." *Id.* at 713, 94 S.Ct. at 3110. The Court then held that the district court had not erred in ordering an *in camera* inspection.

We therefore now similarly scrutinize NBC's claim of privilege, as posed against the interests of defendants in a criminal trial. As a starting point, we repeat an observation we made in *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir.1980), one that we think is still pertinent:

> Whether or not the process of taking First Amendment concerns into consideration can be said to represent recognition by the Court of a "conditional", or "limited" privilege is, we think, largely a question of semantics. The important point for purposes of the present appeal is that courts faced with enforcing requests for the discovery of materials used in the preparation of journalistic reports should be aware of the possibility that the unlimited or unthinking allowance of such requests will impinge upon First Amendment rights.

*Id.* at 595 (footnote omitted).

In *Bruno & Stillman* we were concerned with a range of factual situations evidencing news sources' different levels of expectation as to confidentiality. *Id.* at 597. Other cases have similarly been concerned with protection of confidential sources or information. *See, e.g., United States v. Burke,* 700 F.2d 70 (2d Cir.1983); *Silkwood v. Kerr–McGee Corp.,* 563 F.2d 433 (10th Cir.1977). This is because disclosure of such confidential material would clearly jeopardize the ability of journalists and the media to gather information and, therefore, have a chilling effect on speech.

When there is no confidential source or information at stake, the identification of First Amendment interests is a more elusive task. True, some courts have stated in conclusory fashion that any distinction between subpoenas seeking confidential and nonconfidential materials "is irrelevant as to the chilling effect" that results when the materials are disclosed. *United States v. Blanton,* 534 F.Supp. 295, 297 (S.D.Fla. 1982); *Loadholtz v. Fields,* 389 F.Supp

1299, 1303 (M.D.Fla.1975). *See also United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir.1980). But no illuminating examples or reasoning are produced to support the conclusion. We have been referred to no authoritative sources demonstrating or explaining how any chilling effect could result from the disclosure of statements made for publication without any expectation of confidentiality. *Cf. United States v. Liddy,* 354 F.Supp. at 216 (execution of subpoena seeking such material "involves no restraint on what newspapers may publish or on the type of quality of information reporters may seek to acquire, nor does it threaten the vast bulk of confidential relationships between reporters and their sources") (quoting *Branzburg v. Hayes,* 408 U.S. 665, 691, 92 S.Ct. 2646, 2661, 33 L.Ed.2d 626 (1972)), *motion for emergency stay denied,* 478 F.2d 586. *See generally In re Grand Jury Proceedings,* 810 F.2d 580, 584–85 & n. 6 (6th Cir.1987) (declining to recognize "qualified privilege" for news reporters to withhold information from criminal proceedings); Note, *Evidence— Riley v. City of Chester and United States v. Cuthbertson: An Emerging Federal Common–Law Privilege for Confidential Sources,* 60 U.C.L.A.L.Rev. 656, 677 (1982) ("On the facts of *Cuthbertson I* ... it is difficult to perceive what effect the release of the videotapes [of outtakes] would have had on [the press's] ability to maintain an atmosphere of vigorous, open discussion of news stories.").

In the present case, NBC's asserted First Amendment interests are set forth in an affidavit by Thomas Ross, a Senior Vice President of NBC News. They are five in number. One is that disclosure of outtakes in this case will increase the chances of harassment of the interviewee-witness by the LaRouche organization. This consideration, however, seems to be tied to confidentiality and, in any event, is not a special First Amendment interest. Fick not only appeared in the broadcast but has given substantial testimony in the Frankhauser case and will be an important witness in the upcoming LaRouche trial. His exposure is already evident.

The other four interests named are "the threat of administrative and judicial intrusion" into the newsgathering and editorial process; the disadvantage of a journalist appearing to be "an investigative arm of the judicial system" or a research tool of government or of a private party; the disincentive to "compile and preserve non-broadcast material"; and the burden on journalists' time and resources in responding to subpoenas. There is some merit to these asserted First Amendment interests. We discern a lurking and subtle threat to journalists and their employers if disclosure of outtakes, notes, and other unused information, even if nonconfidential, becomes routine and casually, if not cavalierly, compelled. To the extent that compelled disclosure becomes commonplace, it seems likely indeed that internal policies of destruction of materials may be devised and choices as to subject matter made, which could be keyed to avoiding disclosure requests or compliance therewith rather than to the basic function of providing news and comment. In addition, frequency of subpoenas would not only preempt the otherwise productive time of journalists and other employees but measurably increase expenditures for legal fees. Finally, observing Justice Powell's essential concurring opinion in *Branzburg*, "certainly, we do not hold ... that state and federal authorities are free to annex the news media as an investigative arm of government." 408 U.S. at 709, 92 S.Ct. at 2671 (quotations omitted).

These are legitimate concerns. They must be balanced, however, against the defendants' interests. *Cf. Greater Newburyport Clamshell Alliance v. Public Service Company of New Hampshire*, 838 F.2d 13, 20 (court should develop scope of discovery order by balancing importance of privilege asserted against defending party's need for the information to construct its most effective defense). At stake on the defendants' side of the equation are their constitutional rights to a fair trial under the Fifth Amendment and to compulsory process and effective confrontation and cross-examination of adverse witnesses under the Sixth Amendment. No one or all

of NBC's asserted First Amendment interests can be said to outweigh these very considerable interests of the defendants. *Cf. Branzburg v. Hayes*, 408 U.S. at 690–91, 92 S.Ct. at 2661–62 ("public interest in law enforcement and in ensuring effective grand jury proceedings" outweighs asserted news gathering interests of reporter refusing to testify and expose confidential sources to grand jury). We therefore hold that the district court correctly determined that any First Amendment interest of NBC did not outweigh the defendants' interests in the production of the subpoenaed material.

Contrary to NBC's argument, allowing the production for *in camera* inspection ordered by the district court does not foreshadow allowance of a subpoena in the ordinary run of cases. The factors narrowing our holding are that this is a criminal case; the materials sought concern a major witness who was closely connected with the defendants in activities that are the subject of their indictment; the witness is predictably—from his past testimony—hostile; and the material sought is an extensive interview likely to offer the basis for impeachment. Moreover, the district court manifested proper sensitivity to competing interests; its deliberations were far from captious or casual.

Beyond this, we turn our attention to lingering concerns over the aggregate impact on NBC and others similarly situated of too facile a decision to turn over materials to a defendant. These concerns are answered by another teaching of the Court in *Nixon*.

### The In Camera Review

After resolving the Rule 17(c) and privilege issues in *Nixon*, the Court observed that *in camera* inspection calls "for scrupulous protection against any release" of inadmissible evidence; it noted the district court's "very heavy responsibility to see to it that Presidential conversations ... are accorded that high degree of respect due the President of the United States." *Id.* at 714–15, 94 S.Ct. at 3111.

Similarly, in the present context, we can expect the district court *in camera* to balance the competing constitutional interests, limiting disclosure of journalistic products to those cases where their use would, in fact, be of significant utility to a criminal defendant. An *in camera* proceeding seems especially suited to the needs of all parties in cases like this—where there is a very likely need for materials by the defense, a very real if generalized concern about excessive disclosure on the part of the media, a judicial economy interest in avoiding delay during trial, and the possibility that by the time a decision must be made on disclosure to a party the need for disclosure will have disappeared or diminished. As the Second Circuit observed in *United States v. Burke*, 700 F.2d 70, 78 n. 9 (1983), "We encourage the courts to inspect potentially sensitive documents, especially in situations where, as here, the record reveals that the [magazine's] work papers were not sufficiently voluminous to render *in camera* review impracticable." *See also Bruno & Stillman*, 633 F.2d at 598.

We therefore rely on sensitive district court conduct of *in camera* reviews to respond to the generalized First Amendment concerns that would be triggered by too easy and routine a resort to compelled disclosure of nonconfidential material.

### Subsequent Proceedings

Although the Court in *Nixon* said nothing about any subsequent occasion for review, we think some comments are in order. The district court was understandably concerned over the prospects of allowing counsel to be heard at the point where materials were turned over to defendants. Among the court's concerns were the problems of delay attendant on such a hearing and possible appeal therefrom, as well as similar delays and appeals if the court reserved decision on some material; the waste of resources in recessing a trial; and the unlikelihood that counsel for NBC would know enough about the trial to make a useful argument on the balance of interests at the time of decision. The court therefore did not commit itself to holding a further hearing.

We share the district court's concerns, but think that as a practical matter, serious problems of trial interruption are not likely. In this case, at oral argument, counsel for the government agreed to advise NBC when and if the court decided to release any material for use during trial. This would seem to be a prudent course since it would provide for the presumably remote occasion when a third party, NBC in this case, might have a legitimate basis for protest. The district court can be relied on to provide for such an eventuality.

In most cases, we would assume that the court's assessment of First Amendment interests is unlikely to depart from the view taken in its initial decision, where it had the benefit of NBC's best efforts to make its case. On any decision to disclose, the only new argument possible would be that the defendant's right to the evidence did not outweigh the First Amendment rights. Not only would NBC not normally have detailed knowledge of the course of the trial and thus not likely have a useful view on defendants' needs, but the court will necessarily be vested with broad discretion. And, given the very light weight we have ascribed in this particular case to the various First Amendment concerns advanced by NBC, we can see no real likelihood of any serious appeal. A frivolous resort to appeal or mandamus ought not to occupy much time or effort; in the unlikely event that a substantial question were raised, of course, it would have to be confronted. What we have said merely underscores the near-final effect, for both a third party witness and a defendant, of a decision of the district court following *in camera* review.

*Affirmed.*