**In re SPECIAL PROCEEDINGS.**

**No. Misc. 01–47T.**

United States District Court,
D. Rhode Island.

Oct. 2, 2003.

---

## MEMORANDUM AND ORDER

TORRES, Chief Judge.

### Introduction

Marc DeSisto, a special prosecutor appointed by this Court, has moved to compel James Taricani, an investigative reporter for a local television station, to answer questions posed to Taricani at a deposition. The questions relate to the source from whom Taricani obtained a video tape that was the subject of a protective order (the "Protective Order"). The Protective Order prohibited counsel in a pending criminal case from disseminating the tape because it was evidence in a continuing grand jury investigation regarding the case and it was potential evidence in the trial of that case.

The principal issue presented is whether the First Amendment exempts Taricani from being required to reveal the identity of his source. Because this Court answers that question in the negative, the motion to compel is granted.

## Background

In a series of indictments returned between May 27, 1999, and April 2, 2001, several officials of the City of Providence, Rhode Island, were charged with extortion, bribery, and various other offenses in what were referred to as the "Plunder Dome" cases. Those cases generated intense publicity and rampant speculation regarding the defendants' culpability. The speculation was fueled by numerous "leaks" of evidence that had been presented to the Grand Jury which raised serious concerns about the confidentiality of the grand jury process and the defendants' right to a fair trial.

The first indictment, in the "Glancy case," was handed up on May 27, 1999, and named Joseph Pannone, David Ead, and Rosemary Glancy, three tax officials, as defendants. The second indictment, in the "Corrente case," was handed up on June 29, 2000, and named Pannone and Frank Corrente, the mayor's administrative director, as defendants. On April 2, 2001, a superseding indictment was handed up in the Corrente case adding Mayor Vincent A. Cianci, Jr., and three other defendants. Both cases were assigned to Judge Lagueux who disposed of the Glancy case but recused himself from the Corrente case when the superseding indictment was filed. Eventually, the Corrente case was transferred to me.

In June 2000, while Corrente was awaiting trial and while the grand jury investigation that led to the superseding indictment was continuing, the government moved for a protective order prohibiting counsel in the Corrente case from disclosing the contents of surveillance tapes that had been made by law enforcement officials and furnished to counsel during discovery. Defense counsel assented to that motion, the manifest purposes of which were to avoid compromising the on-going grand jury investigation of Cianci and to avoid pretrial publicity that could prejudice the defendants' right to a fair trial. Both of these concerns previously had been cited by Judge Lagueux as grounds for entering a similar protective order in the Glancy case and in denying media requests for the recordings that were the subject of that order.

On August 8, 2000, Judge Lagueux entered the agreed-upon Protective Order. Nevertheless, on February 1, 2001, while the grand jury investigation of Cianci still was in progress, Taricani and Channel 10 aired one of the tapes. That tape (the "Corrente tape") was a video tape that showed a government witness handing Corrente an envelope that purportedly contained a cash bribe for Corrente and/or Cianci.

Consequently, this Court appointed a special prosecutor to determine whether charges of criminal contempt should be brought against the individual(s) responsible for providing the Corrente tape to Taricani.

Before seeking to depose Taricani, the Special Prosecutor applied for and received permission from the Court to depose five other potential witnesses. The Special Prosecutor represents that, in addition, he has interviewed approximately thirteen or fourteen other individuals and has obtained affidavits from three or four of them. Having exhausted what he believed to be all other means of obtaining the information necessary to conclude his investigation, the Special Prosecutor requested the issuance of a subpoena requiring Taricani to appear for a deposition and this Court granted that request.

At his deposition, Taricani refused to answer any questions regarding the identity of the person from whom he received the Corrente tape citing what he asserted

to be a "newsman's privilege" not to reveal confidential sources. Because of that refusal, the Special Prosecutor filed the instant motion to compel.

In their "Memorandum of Law in Opposition to Motion to Compel Testimony" and during a hearing on that motion, Taricani's counsel have offered three reasons why Taricani should not be required to provide the requested information. They argue:

1. That the Protective Order is invalid.

2. That even if the Protective Order is valid, compelling Taricani to identify his source no longer serves any purpose because the trials are over.

3. That the First Amendment prevents Taricani from being required to disclose the identity of confidential sources.

### Analysis

I. *Validity of the Protective Order*

Taricani does not and could not claim that the Protective Order is invalid for *substantive* reasons. Indeed, the Order mirrors the provisions of both the Local Rules of this Court and the Rules of Professional Responsibility that prohibit counsel in criminal cases from releasing any information or making any extra-judicial statements that may interfere with a fair trial. R.I. Dist. Ct. Local Rule 39; R.I. Rule of Professional Conduct 3.6. Moreover, given the intense publicity surrounding this case and the highly-prejudicial nature of the Corrente tape, the Protective Order clearly was a reasonable means of seeking to preserve the defendants' right to a fair trial. *See In re Providence Journal Co.*, 293 F.3d 1, 14 (1st Cir.2002)("In view of the notoriety of the [Cianci] case and the incidents recounted by the district court, we are convinced that the court's perception of a threat to the defendants'

fair trial rights was objectively reasonable.").

■ Instead, Taricani argues that the Protective Order is invalid because it fails to comport with the *procedural* requirements outlined by the First Circuit in *In re Providence Journal;* and, therefore, the Protective Order cannot be the basis for requiring him to identify the person who provided him with the Corrente tape. More specifically, Taricani asserts that the Protective Order was entered without an opportunity to be heard and that Judge Lagueux failed to make specific findings with respect to the competing interests involved or to weigh reasonable alternatives. That argument misapprehends both the holding in *In re Providence Journal* and the nature of criminal contempt.

■ *In re Providence Journal* addressed the procedural requirements for deciding whether materials that are filed with a court and that become part of the official record of a case ought to be sealed. *In re Providence Journal* did not address the procedure regarding the issuance of protective orders prohibiting the parties in a pending case from disseminating materials obtained by them during the course of pretrial discovery. The distinction is important because the media have a presumptive common-law right of access to judicial records but not to potential evidence possessed by the parties. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) ("[P]retrial depositions and interrogatories are not public components of a civil trial .... restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information."); *In re Associated Press*, 162 F.3d 503, 512 (7th Cir.1998) ("Until admitted into the record, potential evidence is not ordinarily within the scope of press access."); *United States v. Wolfson,*

55 F.3d 58, 60 (2d Cir.1995) (no public right of access to documents submitted to court *in camera* as part of discovery dispute); *Grove Fresh Distrib., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 898 (7th Cir.1994) (potential evidence not yet admitted is not within the scope of press access); *Public Citizen v. Liggett Group*, 858 F.2d 775, 780 (1st Cir.1988) ("Certainly the public has no right to demand access to discovery materials which are solely in the hands of private party litigants."). In fact, as already noted, both the Local Rules of this Court and applicable rules of professional responsibility expressly prohibit counsel from disseminating or discussing potential evidence in a pending criminal case. R.I. Dist. Ct. Local Rule 39 (prohibiting lawyers from discussing or releasing evidence to the public pending trial); R.I. Rule of Professional Conduct 3.6 (prohibiting lawyers from making extra-judicial statements regarding potential evidence, witnesses or testimony); *see also* ABA Model Rules of Professional Conduct Rule 3.6, cmt. 1 ("Preserving the right to a fair trial necessarily entails some curtailment of the information that may be disseminated about a party prior to trial, particularly where trial by jury is involved.").

Here, all procedural requirements for the entry of a protective order were satisfied. The government's motion was served on all parties and both the motion and the Protective Order, itself, were filed and made a matter of public record. Thus, while it is difficult to imagine any basis upon which the media or any other nonparty could have challenged the Protective Order, *see Rosato v. The Superior Court of Fresno County*, 51 Cal.App. 3rd 190, 208, 124 Cal.Rptr. 427 (5th Dist.1975) ("[T]he trial court does not have a duty to consult with the press or to allow them representation at hearings regarding whether or not to disclose evidence prior to trial."), non-parties had constructive notice that

the order was being entered and an opportunity to seek to contest it. Moreover, since all of the parties in the case assented to the Protective Order, and, since the Order was not challenged, there was no need for Judge Lagueux to recite the patently obvious reasons for entering it. *In re Providence Journal* does not hold, and it would be absurd to suggest, that, under such circumstances, a court may not enter a protective order unless it first provides some unspecified form of additional notice to unidentified non-parties who might possibly claim some interest in the matter.

■ Even if it is assumed, *arguendo,* that the procedure for adopting the Protective Order was deficient, Taricani's argument would fail for two reasons. First, the Protective Order was directed at participants in the case and not at Taricani. Therefore, Taricani lacks standing to challenge the Order because he, himself, is not in danger of being prosecuted for violating it and he cannot contest enforcement of the Order on behalf of those who may be targets of the Special Prosecutor's investigation.

■ Second, the alleged procedural deficiency does not render the Protective Order invalid or unenforceable, *vis a vis* the individuals against whom it is directed. It is well established that court orders must be complied with unless and until they are vacated on appeal or otherwise. *In re Providence Journal Co.*, 820 F.2d 1342, 1346 (1st Cir.1986) (*"Providence I"*) *modified on reh'g en banc,* 820 F.2d 1354 (1st Cir.1987) ("Providence II"). Generally, a court order may not be collaterally attacked by asserting its invalidity as a defense to a charge of criminal contempt brought against one who has violated that order. *Id.* The rationale for this "collateral bar rule" is to "protect the authority of the courts when they address close ques-

tions and to create a strong incentive for parties to follow the orderly process of law." *Id.* at 1347.

A limited exception to the collateral bar rule is made in those extremely rare cases where the order may be "transparently invalid." *Id.* However, this, clearly, is not one of those cases. There is a strong presumption in favor of the validity of court orders. *Id.* at 1347–48. An order is deemed transparently invalid only if it "had [no] pretense of validity at the time it was issued." *United States v. Mourad,* 289 F.3d 174, 178 (1st Cir.2002) (quoting *Providence I,* 820 F.2d at 1347). The "transparently invalid" exception does not apply to orders that are "arguably proper." *Providence I,* 820 F.2d at 1347. Here, for reasons already stated, the Protective Order in question was, at the very least, "arguably proper."

## II. *The Purpose Served by Requiring Disclosure*

Taricani's counsel argue that requiring Taricani to identify the source from whom he received the Corrente tape no longer serves the purpose of protecting the defendants' right to a fair trial because the trial is over. That argument does not merit protracted discussion.

The Protective Order served two purposes. It was designed to avoid prejudicial pretrial publicity likely to threaten the defendants' right to a fair trial and to prevent the grand jury's on-going investigation from being compromised. The fact that the investigation has been completed and that the trial is over does not negate the purposes served by prosecuting those who may have wilfully violated the Protective Order any more than the fact that a murder has already been committed or the fact that a murder attempt was unsuccessful negates the purposes served by prosecuting the perpetrator. Indeed, accepting Taricani's argument would render protective orders meaningless. Individuals bent on preventing a fair trial or interfering with a grand jury investigation could violate such orders with impunity knowing that they would not be prosecuted unless they were apprehended and convicted before the case concluded.

## III. *The First Amendment*

The First Amendment to the United States Constitution guarantees freedom of expression to both the media and ordinary citizens. It provides that "Congress shall make no law ... abridging the freedom of speech, or of the press ..." U.S. Const. amend. I.

The gist of Taricani's argument is that freedom of the press also protects a journalist from being required to identify "confidential sources" because disclosure would impair the journalist's ability to gather information for dissemination thereby chilling free speech. Taricani Mem. in Opp'n to Mot. to Compel at 6. In support of his position, Taricani has filed an affidavit stating that the source who provided him with the Corrente tape "did so only upon obtaining my assurance that I would protect the confidentiality of the identity of the source." Taricani Aff. ¶ 3.

Taricani implicitly concedes that the "newsman's privilege" that he asserts is only conditional and that it may be overcome when the need for the information regarding his source outweighs the impact that disclosure would have on the newsgathering process; but, he contends that, in this case, no sufficient showing of need has been made because the Special Prosecutor has failed to establish that he has exhausted alternative sources for obtaining the requested information.

## A. *Branzburg v. Hayes*

In *Branzburg v. Hayes*, the Supreme Court, in a plurality opinion, specifically held that a journalist has no First Amendment privilege to refuse to disclose the identity of a confidential source to a grand jury investigating a crime when that information is relevant to the investigation. 408 U.S. 665, 690–91, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

*Branzburg* noted that requiring disclosure does not impinge on the journalist's freedom of expression. The Court stated: "these cases involve no intrusions upon speech or assembly, no prior restraint or restriction on what the press may publish, and ... no penalty, civil or criminal, related to the content of published material." *Id.* at 681, 92 S.Ct. 2646.

*Branzburg* also noted that an ordinary citizen has no privilege to withhold evidence relevant to a criminal investigation and it rejected the notion that a journalist has any greater right to do so. The Court cited the "longstanding principle that 'the public ... has a right to every man's evidence,'" *id.* at 688, 92 S.Ct. 2646, and observed that "neither the First Amendment nor any other constitutional provision protects the average citizen from disclosing to a grand jury information that he has received in confidence." *Id.* at 682, 92 S.Ct. 2646. The Court expressly declined "to create [a newsman's privilege] by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy." *Id.* at 690, 92 S.Ct. 2646. Instead, *Branzburg* held that "reporters, like other citizens, [must] respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." *Id.* at 690–91, 92 S.Ct. 2646.

Although *Branzburg* rebuffed the claim of "newsman's privilege," the Court did recognize that the First Amendment affords "some" protection to news gathering activities. The Court stated: "[w]e do not question the significance of free speech, press, or assembly to the country's welfare. Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated." *Id.* at 681, 92 S.Ct. 2646.

However, the *Branzburg* Court described as "uncertain" the burden that might be placed on news gathering by requiring a journalist to reveal the identity of a "confidential source" in connection with a bona fide criminal investigation. *Id.* at 690, 92 S.Ct. 2646. Moreover, the Court made it clear that the First Amendment protection accorded to news gathering activities is not absolute. After pointing out that "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability," *id.* at 682, 92 S.Ct. 2646, the Court stated:

> Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news. Neither is immune, on First Amendment grounds, from testifying against the other, before the grand jury or at a criminal trial. The Amendment does not reach so far as to override the interest of the public in ensuring that neither reporter nor source is invading the rights of other citizens through reprehensible conduct forbidden to all other persons.

*Id.* at 691–92, 92 S.Ct. 2646.

In assessing the burden that might be placed on news gathering activities by requiring a journalist to identify a "confiden-

tial source" who has information regarding the commission of a crime, *Branzburg* noted that the issue was likely to arise in only a relatively small number of cases.

> Only where news sources themselves are implicated in crime or possess information relevant to the grand jury's task need they or the reporter be concerned about grand jury subpoenas. Nothing before us indicates that a large number or percentage of all confidential news sources falls into either category and would in any way be deterred by our holding that the Constitution does not, as it never has, exempt the newsman from performing the citizen's normal duty of appearing and furnishing information relevant to the grand jury's task.

*Id.* at 691, 92 S.Ct. 2646.

With respect to those cases where the source participated in the crime, the Court also made it clear that the source's "preference for anonymity" in order to avoid prosecution "is hardly deserving of constitutional protection." *Id.* With respect to those cases where the source might prefer confidentiality for other reasons, the Court found that: "the evidence fails to demonstrate that there would be a significant construction of the flow of news to the public," *id.* at 693, 92 S.Ct. 2646, if it refused to recognize a "newsman's privilege." The *Branzburg* Court further found that even the possibility that fear of identification might deter some sources not implicated in crimes from talking to journalists would be insufficient to justify creation of a "newsman's privilege."

> [W]e cannot accept the argument that the public interest in possible future news about a crime from undisclosed, unverified sources must take precedence over the public interest in pursuing and prosecuting those crimes reported to the press by informants and in thus deterring the commission of such crimes in the future.

*Id.* at 695, 92 S.Ct. 2646.

In short, *Branzburg* found "no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." *Id.* at 690–91, 92 S.Ct. 2646. Rather, the Court indicated that, in a criminal case, the relevant inquiry in determining whether the First Amendment protects a journalist's confidential sources is whether that information is "germane" to a "good faith" investigation. *See id.* at 700, 707, 92 S.Ct. 2646.

*Branzburg* also specifically rejected the claim that the government, first, must show "that a crime has been committed and that [the reporter] possess[es] relevant information not available from other sources ..." and stated that "only the grand jury itself can make this determination." *Id.* at 701, 92 S.Ct. 2646. The Court explained that "society's interest is best served by a thorough and extensive investigation" and that "[a] grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way...." *Id.* (citations omitted). The Court pointed out the "Catch 22" that such a requirement would create:

> 'It is impossible to conceive that in such cases the examination of witnesses must be stopped until a basis is laid by an indictment formally preferred, when the very object of the examination is to ascertain who shall be indicted.'

*Id.* at 702, 92 S.Ct. 2646 (quoting *Hale v. Henkel*, 201 U.S. 43, 65, 26 S.Ct. 370, 50 L.Ed. 652 (1906)).

In addition, *Branzburg* outlined the "practical and conceptual difficulties of a high order" that would be involved in administering such a "conditional" privilege. *Id.* at 704, 92 S.Ct. 2646. The Court cited the problems that would arise in defining the "categories of newsmen who qualified for the privilege"; whether there is "probable cause to believe a crime has been committed"; whether it is "likely that the reporter has useful information gained in confidence"; whether the investigating authority could "obtain the information elsewhere"; and whether "the official interest" in obtaining the information is "sufficient to outweigh the claimed privilege." *Id.* at 704–06, 92 S.Ct. 2646.

In his concurring opinion, Justice Powell reiterated that the Court was not holding that newsmen "are without constitutional rights with respect to the gathering of news." *Id.* at 709, 92 S.Ct. 2646 (Powell, J., concurring). He observed that the plurality opinion established that newsmen could not be harassed by investigations that were not conducted in "good faith" and that they could be required to give information about confidential sources only if that information bears more than "a remote and tenuous relationship to the subject of the investigation" and serves "a legitimate need of law enforcement." *Id.* at 710, 92 S.Ct. 2646.

The holding in *Branzburg* was underscored in *New York Times Co. v. Jascalevich,* where the Court denied an application to stay a contempt order against a journalist for refusing to produce documents subpoenaed in connection with a criminal case and stated:

> There is no present authority in this Court either that newsmen are constitutionally privileged to withhold duly subpoenaed documents material to the prosecution or defense of a criminal case or that a defendant seeking the subpoena

must show extraordinary circumstances before enforcement against newsmen will be had.

439 U.S. 1317, 1322, 99 S.Ct. 6, 58 L.Ed.2d 25 (1978).

## B. *Bruno & Stillman and its Progeny*

Since *Branzburg,* the First Circuit has had three occasions on which to address the extent to which the First Amendment protection afforded to a journalist's news-gathering activities prevents the journalist from being required to reveal the identity of confidential sources. *Cusumano v. Microsoft Corp.,* 162 F.3d 708 (1st Cir.1998); *United States v. The LaRouche Campaign,* 841 F.2d 1176 (1st Cir.1988); *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir.1980). *Bruno & Stillman* and *Cusumano* involved discovery disputes in civil cases where the interest in disclosure, generally, is less compelling than it is in criminal cases. *LaRouche* was a criminal case in which disclosure was required on the ground that the information was not confidential and that, in any event, any First Amendment concerns were outweighed by the defendant's Fifth and Sixth Amendment rights to a fair trial.

In *Bruno & Stillman,* a newspaper being sued for libel appealed an order compelling a reporter, at his deposition, to identify "confidential sources" referred to in the allegedly defamatory article. The Court stated that whether a reporter has a conditional privilege not to reveal confidential sources in connection with a civil defamation case where the plaintiff is not a public figure was an "open" question. *Bruno & Stillman,* 633 F.2d at 594. The Court acknowledged that *Branzburg* had denied the existence of any such privilege in criminal cases where the need for requiring disclosure was "compelling" and "obvious," *id.,* but it noted that *Branzburg* also recognized that the First Amendment

interests involved were not "beyond the pale of any protection." *Id. Bruno & Stillman* sought to reconcile these pronouncements by adopting a balancing test.

> [C]ourts faced with enforcing requests for the discovery of materials used in the preparation of journalistic reports should be aware of the possibility that the unlimited or unthinking allowance of such requests will impinge upon First Amendment rights. In determining what, if any, limits should accordingly be placed upon the granting of such requests, courts must balance the potential harm to the free flow of information that might result against the asserted need for the requested information.

*Id.* at 595–96.

*Bruno & Stillman* directs that, in striking that balance in a civil case, the principles governing the scope of discovery under Fed.R.Civ.P. 26 should be applied "with a heightened sensitivity to any First Amendment implication that might result from the compelled disclosure of sources." *Id.* at 596. It holds that "[a]s a threshold matter, the court should be satisfied that a claim is not frivolous, a pretense for using discovery powers in a fishing expedition" and that "the desired information appears more than remotely relevant." *Id.* at 597. *Bruno & Stillman* also enumerates some of the factors to be assessed, which include the "extent to which there is a need for confidentiality" and the "importance to the [reporter's] continued newsgathering effectiveness of preserving the source's confidentiality." *Id.* at 597–98. It suggests that "in cases of continuing uncertainty," a court "*could*" also require that resort to non-confidential sources first be exhausted.

*Id.* at 598 [emphasis added]. However it did not mandate such a requirement.[1] Indeed, at least in criminal cases, doing so would be directly contrary to the express language in *Branzburg*, 408 U.S. at 701, 705–06, 92 S.Ct. 2646.

*LaRouche* was a criminal case in which, pursuant to Fed.R.Crim.P. 17(c), the defendant subpoenaed the out-takes of a television interview of an important government witness. The Court of Appeals found that the out-takes did not involve confidential information but that, because "First Amendment interests" were implicated even with respect to non-confidential information, the disclosure should not be "routine[ly]," "casually" or "cavalierly" compelled. 841 F.2d at 1182. Nevertheless, the Court found that those interests were outweighed by the defendant's Fifth Amendment right to a fair trial and Sixth Amendment right to confront and effectively cross examine adverse witnesses. Consequently it upheld the District Court's denial of a motion to quash the subpoena. *Id.*[2]

*Cusumano* was a civil action brought for the purpose of obtaining notes of interviews conducted by two professors in the course of doing research for a forthcoming book on the Internet competition between Netscape and Microsoft. Microsoft sought the notes for use in defending a civil antitrust case pending in another jurisdiction and the District Court denied its request.

Like *Bruno & Stillman*, *Cusumano* applied the principles governing the scope of discovery in civil cases. The *Cusumano* Court accepted the District Court's finding

---

1. After concluding that the record was not sufficiently developed to permit the relevant factors to be properly balanced, the Court in *Bruno & Stillman* vacated the order granting the plaintiff's motion to compel and remanded the case for further consideration.

2. The Court also "reject[ed] NBC's reliance upon a federal common law privilege wholly apart from the First Amendment." 841 F.2d at 1178 n. 4.

that the information was "confidential," 162 F.3d at 715, and, in applying the balancing test described in *Bruno & Stillman,* it adopted a three-part burden-shifting analysis:

> Initially, the movant must make a prima facie showing that his claim of need and relevance is not frivolous. Upon such a showing, the burden shifts to the objector to demonstrate the basis for withholding the information. The court then must place those factors that relate to the movant's need for the information on one pan of the scales and those that reflect the objector's interest in confidentiality and the potential injury to the free flow of information that disclosure portends on the opposite pan.

*Id.* at 716 (citations omitted).

*Cusumano* concluded that the District Court had properly balanced the relevance of the requested information and the legitimacy of Microsoft's request against the fact that the information was available to Microsoft by other means inasmuch as the professors' sources were identified in their book; the fact that promises of confidentiality were important in helping scholars obtain access to needed information; and the fact that the professors' status as non-parties to the anti-trust litigation diminished the justification for imposing the burden of discovery on them. *Id.* at 716–17. Accordingly, the Court affirmed the denial of the motion to compel.

### C. *Synthesizing the Cases*

When *Branzburg* is read together with *Bruno & Stillman* and its progeny, the following principles emerge as general guidelines for determining the extent to which First Amendment considerations protect the confidentiality of a journalist's sources in any particular case:

1. A journalist has no First Amendment privilege to refuse to disclose the identity of a "confidential source" where that information is relevant to a legitimate criminal investigation. *Branzburg,* 408 U.S. at 690–91, 92 S.Ct. 2646.

2. The First Amendment does afford a lesser degree of protection to the confidentiality of a journalist's sources when those sources are utilized in gathering news to be disseminated to the public. *See id.* at 681, 92 S.Ct. 2646; *Bruno & Stillman,* 633 F.2d at 595–96.

3. The degree of protection depends upon the circumstances of each case and cannot be determined by "black letter pronouncement[s]." *Bruno & Stillman,* 633 F.2d at 596.

4. In deciding whether disclosure should be required, "courts must balance the potential harm to the free flow of information that might result from disclosure against the asserted need for the requested information." *Id.* at 595–96. In any event, disclosure should not be "casually" or "cavalierly" compelled. *LaRouche,* 841 F.2d at 1182.

5. A preliminary showing of need may be made by establishing that the information sought is "germane" to a "good-faith" criminal investigation, *see Branzburg,* 408 U.S. at 700, 707, 92 S.Ct. 2646, or that it "appears more than remotely relevant" to a non-frivolous claim. *Bruno & Stillman,* 633 F.2d at 597.

6. "[I]n cases of continuing uncertainty," a court may require the requesting party to demonstrate that alternative sources have been exhausted. *Id.* at 598. However, at least in criminal cases, exhaustion is not an absolute requirement because of the strong public interest in "a thorough

and extensive investigation," that requires "every available clue" to be pursued and all pertinent witnesses to be examined, *Branzburg*, 408 U.S. at 701, 92 S.Ct. 2646 (citations omitted), as well as the practical difficulties involved in making such a showing. *See id.* at 704–06, 92 S.Ct. 2646.

7. In criminal cases any impact that disclosure would likely have on the free flow of information generally is outweighed by the strong public interest in investigating crimes and prosecuting the perpetrators as well as a defendant's right to a fair trial and to obtain information relevant to a defense. *See id.* at 690–91, 695, 92 S.Ct. 2646; *LaRouche*, 841 F.2d at 1182.

### D. *The Effect of State Law*

 Taricani concedes that his claim of newsman's privilege is governed by federal law. Taricani's Mem. in Opp'n to Mot. to Compel, at 6 n.2. Nevertheless, he argues that this Court should look to the Rhode Island Newsman's Privilege Act for guidance in determining the scope of protection afforded to his sources by the First Amendment. *Id.* In making that argument, Taricani relies on the Second Circuit's opinion in *von Bulow v. von Bulow*, 811 F.2d 136 (2d Cir.1987). However, apart from the fact that *von Bulow* is not binding precedent in this Circuit, it does not support Taricani's argument.

*von Bulow* affirmed a contempt order against a third-party witness who refused to comply with a subpoena directing her to produce documents during the course of discovery. The witness claimed that the documents were investigative reports and notes that were protected from discovery by journalistic privilege. The Court found that the issue was governed by federal law

and, while the Court stated that "[a]lthough we are not bound to follow New York law, neither should we ignore New York's policy [manifested in New York's 'shield' statute] of giving protection to professional journalists," *id.* at 144, it did not suggest that state law could alter established principles of federal law. On the contrary, that statement was made after the Court had found that, under applicable Second Circuit precedent, the witness could not claim a journalistic privilege because she did not prepare the documents for the purpose of disseminating information to the public. *Id.* at 143. The Court referred to the New York "shield" statute simply to point out that it, too, required that information must be gathered for the purpose of disseminating it to the public in order to qualify for any journalistic protection. *Id.* at 144.

In this case, it is doubtful that the Rhode Island Newsman's Privilege Act (the "Act") would protect the confidentiality of Taricani's source. By its terms, the Act does not apply "[t]o the source of any information concerning the details of any grand jury or other proceeding which was required to be secret under the laws of the state." R.I. Gen. Laws § 9–19.1–3(2). Clearly, the Corrente tape dealt with the details of a grand jury proceeding because it had been presented as evidence to the grand jury that had indicted Corrente and was continuing to investigate the charges against Cianci and the other defendants named in the superseding indictment.

Moreover, for reasons previously stated and further explained in Section III *infra*, any privilege that might be accorded by the Act would be inconsistent with clearly established principles of federal law set forth in *Branzburg* and the relevant First Circuit decisions. Consequently, even if Rhode Island law could be construed as creating such a privilege, it could not

trump the strong federal interest in enforcing court orders; preserving grand jury secrecy; and protecting the constitutional rights of criminal defendants that underlie these principles. *See United States v. Gillock*, 445 U.S. 360, 373, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980) ("[W]here important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields.").

In any event, any privilege created by the Act may be overcome if a court finds "substantial evidence that disclosure of the information or of the source of the information is necessary to permit a criminal prosecution for the commission of a specific felony ... and that the information or the source of the information is not available from other prospective witnesses." R.I. Gen. Laws § 9–19.1–3(c). Thus, at most, the Act provides for a balancing test similar to the one prescribed by *Bruno & Stillman*.

## IV. *Applying the Balancing Test*

### A. *Weighing the Factors*

#### 1. *Status as a Journalist*

■ The first question that must be asked in determining the extent to which the First Amendment may protect the identity of a confidential source is whether the party claiming protection is a journalist. Here, there is no question that Taricani is a well-respected journalist, a status that even the Special Prosecutor does not dispute.

#### 2. *Good Faith*

In balancing "the potential harm to the free flow of information" that might result from requiring Taricani to identify the individual from whom he obtained the Corrente tape, "against the asserted need" for that information, *Bruno & Stillman*, 633 F.2d at 596, the threshold question is whether the claim pursuant to which the request is made is "frivolous" or "a pretense for ... a fishing expedition." *Id.* at 597. In the context of a criminal investigation, the question has been expressed as whether the information is "germane" to a "good faith" investigation. *Branzburg*, 408 U.S. at 701, 707, 92 S.Ct. 2646.

Here, it is clear that the Special Prosecutor is engaged in a good-faith investigation. It is uncontroverted that the Corrente tape was subject to the Protective Order entered by the Court and it seems patently obvious that someone willfully violated that Order. Furthermore, the investigation was initiated at the behest of the Court, itself, and cannot be described as the arbitrary action of a possibly overzealous prosecutor or runaway grand jury having ulterior motives.

#### 3. *Relevance*

Proffered evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. In this case, the identity of Taricani's source is clearly "germane" and highly relevant to the Special Prosecutor's investigation because it appears almost certain that the source either violated the Protective Order or obtained the Corrente tape from someone who did.

#### 4. *Need for the Information*

The Special Prosecutor also has demonstrated a compelling need to learn the identity of Taricani's source because it further appears that this information would provide the only means for determining who, if anyone, should be charged with criminal contempt. Given the apparently criminal nature of the act and the number of persons who had access to copies of the

Corrente tape, it seems highly unlikely that the identity of Taricani's source could be obtained from anyone other than Taricani. At the very least, the identity of Taricani's source clearly would provide the most reliable and direct evidence regarding the apparent violation of the Protective Order.

This Court is mindful of the admonition that a journalist should not be "routinely" or "cavalierly" required to reveal the identity of a "confidential source." *LaRouche,* 841 F.2d at 1182. Thus, even though such information may be relevant to an issue in the case, courts should be hesitant to compel disclosure where it is obvious that the same information may be readily available from alternative sources.

However, that does not mean that, in order to demonstrate need, the requesting party must prove a negative by presenting compelling evidence that the information cannot be obtained in any other way. As already noted, a showing of exhaustion "could" be required "in cases of continuing uncertainty" but it is not mandated and it especially is not mandated in criminal cases where the public interest in effective law enforcement. is particularly strong. *See Bruno & Stillman,* 633 F.2d at 598; *Branzburg,* 408 U.S. at 701, 705–06, 92 S.Ct. 2646.

Requiring the investigating authority in a criminal case to prove that it has exhausted all other means for obtaining relevant information before it can seek that information from a journalist would create serious problems and risks. It would present practical difficulties in determining the point at which alternative sources have been exhausted and whether the evidence available from those sources is as probative as the information in the journalist's possession. Such a requirement also would threaten to compromise the investigation because disclosing the efforts made to otherwise obtain that information could alert potential targets of the investigation thereby enabling them to flee, destroy evidence, and/or attempt to influence witnesses. Finally, as this case aptly illustrates, such a requirement would delay the investigation by forcing the investigating authority to by-pass the most direct evidence available and begin its investigation by eliminating all possible alternative and, probably less reliable, sources for obtaining that evidence.

In any event, although, under these circumstances, the Special Prosecutor is not required to, first, establish that he has exhausted alternative sources for obtaining the requested information; he, nevertheless, has done so. As previously stated, before seeking the identity of Taricani's source, the Special Prosecutor deposed and interviewed numerous other potential witnesses and he has represented that obtaining the identity of Taricani's source is necessary to properly complete his investigation. Under these circumstances, nothing further is required.

### 5. *Impact on the Free Flow of Information*

There are several reasons why this Court finds that any burden on the free flow of information that might result from requiring Taricani to disclose the identity of his source would be rather limited.

First, this is one of what *Branzburg* described as a relatively small number of cases involving the investigation and prosecution of a criminal act in which the "confidential source" appears to be implicated or can identify the perpetrator. 408 U.S. at 691, 92 S.Ct. 2646. Thus, even if requiring disclosure under these somewhat unique circumstances deters some potential sources from, in the future, unlawfully providing similar information, it is unlikely to significantly impair Taricani's news-

gathering activities. *See id.* at 690–91, 92 S.Ct. 2646.

Second, even assuming *arguendo*, that Taricani's source is *not* subject to prosecution for violating the Protective Order, there is nothing, other than the source's own statement to support the assertion that an assurance of anonymity was a *sine qua non* for providing the tape. Without having an opportunity to question the source and without knowing the source's reasons for desiring confidentiality, it is difficult to determine whether the source would have provided the tape, either directly or covertly, even in the absence of such an assurance. If the source is not implicated in the apparent violation of the Protective Order, the source's statement may simply reflect a "preference for anonymity," *id.* at 691, 92 S.Ct. 2646, that the source might have been willing to relinquish, if pressed. *Id.* at 693–94, 92 S.Ct. 2646. On the other hand, if the source *is* implicated, even an insistence on secrecy would be something that *Branzburg* describes as "hardly deserving of constitutional protection." *Id.* at 691, 92 S.Ct. 2646.

Third, it is doubtful that the source's willingness to provide the Corrente tape rested, to any appreciable extent, on the limited protection afforded by the type of conditional newsman's privilege advocated by Taricani. By definition, such a conditional privilege provides no guarantee of confidentiality because it may be overridden when a court determines that it is outweighed by the need for disclosure. If Taricani informed his source of that fact, the source could not have had any justifiable expectation of anonymity. If Taricani failed to inform his source of that fact, such failure cannot serve as a basis for refusing to furnish the requested information.

### 6. *The Public Interest*

Taricani suggests that the public interest is served by keeping the identity of his source secret because, on previous occasions, his reporting of information provided by confidential sources pursuant to a promise of anonymity has led to investigations and prosecutions of individuals engaged in criminal activity. That argument might have some merit in a case where the information provided by the source prompts an investigation or prosecution of alleged wrongdoing that, otherwise, would not have been pursued. However, this, clearly, is not one of those cases. Here, when the Corrente tape was provided to Taricani, the investigation and prosecution in the "Plunder Dome" cases already were well underway. Furthermore, the tape already had been presented to the Grand Jury and was potential evidence in the upcoming trials. Consequently, dissemination of the tape contributed nothing to the investigation or prosecution of the alleged offenses. On the contrary, it only threatened to compromise the Grand Jury's investigation and/or violate the defendants' right to a fair trial.

### B. *Striking the Balance*

It should be noted that this is not a case in which a confidential source *lawfully* provided information to a journalist. Rather, it is a case in which the information appears to have been provided in violation of a court order. Accordingly, under these circumstances allowing the identity of the source to remain secret, in effect, would allow the conditional First Amendment protection afforded to a journalist's newsgathering activities to be used as a shield to protect from prosecution individuals who have apparently engaged in criminal activity. Thus it would frustrate what *Branzburg* described as the strong public

interest in "effective law enforcement." *Id.* at 690, 92 S.Ct. 2646.

With that in mind, and having assessed and carefully weighed all of the relevant factors, this Court finds that the scale referred to in *Cusumano* decisively tips in favor of requiring Taricani to disclose the identity of his source. The identity of Taricani's source is clearly relevant to a "good faith" criminal investigation being conducted by the Special Prosecutor. Furthermore, the Special Prosecutor has demonstrated a compelling need for that information which is buttressed by the strong public interest in seeing that court orders are enforced and that criminal acts that threaten to compromise grand jury investigations and to deprive defendants of their constitutional right to a fair trial are punished. Those factors greatly outweigh the relatively modest impact that disclosure might have on the free flow of information and/or any interest that the public may have in obtaining a preview of evidence likely to be presented at a criminal trial.

### Conclusion

For all of the foregoing reasons, the Special Prosecutor's Motion to Compel is granted and Taricani is ordered to answer any questions posed to him by the Special Prosecutor regarding the source from whom or from which he obtained the Corrente tape.

IT IS SO ORDERED